# EXHIBIT 2



# Testimony of
# **Whitney Larson**

October 19, 2023

## **Candace LaPlant-Turner v. Hy-Vee, Inc.**

4:23-CV-00042-GAF

Emerald Court Reporting, LLC
(913) 383-2400

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

CANDACE LAPLANT-TURNER,
    Plaintiff,
v.        No. 4:23-cv-00042-GAF
HY-VEE, INC.,
    Defendant.

ZOOM VIDEOCONFERENCE DEPOSITION OF
WHITNEY J. LARSON

Pursuant to Notice, the deposition of WHITNEY J. LARSON, a Witness, was taken on behalf of the Plaintiff, on October 19, 2023. The deposition was conducted via video teleconference with each party appearing remotely upon agreement of the parties.

The proceedings were recorded stenographically by Glenda Moeller, RMR, CRR, Certified Stenographic Reporter in Kansas and Missouri.

## Page 2

APPEARANCES

FOR THE PLAINTIFF:
    Mr. Marcos A. Barbosa
    MAB LAW-KC
    1100 Main Street, Suite 1650
    Kansas City, Missouri 64105
    816.499.8800
    marcos.barbosa@mablawkc.com

FOR THE DEFENDANT:
    Ms. Jeannie M. DeVeney
    Ms. LaceShionna N. Cline
    LITTLER MENDELSON P.C.
    1201 Walnut Street, Suite 1450
    Kansas City, Missouri 64106
    816.627.4405
    jdeveney@littler.com
    lcline@littler.com

## Page 3

I N D E X

WITNESS:                PAGE
  WHITNEY J. LARSON
EXAMINATION BY MR. BARBOSA      4
EXAMINATION BY MS. DEVENEY      128

Reporter's Note: No exhibits were marked.

## Page 4

(Deposition commenced at 9:04 a.m.)

WHITNEY J. LARSON, a witness, being first duly sworn remotely by agreement of the parties, testified under oath as follows:

EXAMINATION

BY MR. BARBOSA:

Q. Ma'am, will you state your full name for the record, please?

**A. Whitney Jean Larson.**

Q. And, Ms. Larson, have you given a deposition before?

**A. I have not.**

Q. Have you ever been a plaintiff or a defendant in any lawsuit?

**A. No, I have not.**

Q. Have you ever been arrested or convicted of a crime?

**A. No, I have not.**

Q. And today are you -- or do you have any physical condition that would prevent you from hearing me or testifying truthfully?

**A. No, I do not.**

Q. And are you on any medications that, again, would prevent you from hearing me today or

*Emerald Court Reporting, LLC*      *(913) 383-2400*

*www.emeraldcourtreporting.com*

## Page 29

A. I believe he was a manager of store operations or perishables.

Q. And how long were you the store director at Storm Lake?

A. About seven months.

Q. After Storm Lake, so after seven months, where did you go?

A. Back to the Twin Cities, to Cottage Grove Hy-Vee.

Q. Cottage?

A. Yes.

Q. Grove?

A. Yes.

Q. And what position did you take with Cottage Grove Hy-Vee?

A. Store manager.

Q. So would that have been a demotion?

A. Yes. Hy-Vee restructured in early 2020, and I was asked to go back as a store manager.

Q. Did this restructure, did it -- was it a store general restructuring or were just particular individuals within the structure of Hy-Vee that were asked to take different positions?

MS. DEVENEY: Objection. Vague.

## Page 30

You can answer.

A. It was an entire company restructuring. So there was many individuals throughout the company that were asked to take steps back.

BY MR. BARBOSA:

Q. Did your pay suffer as a consequence?

A. I do believe so.

Q. And when did this happen? Also 2020?

A. Early 2020, right before the pandemic.

Q. So you went as a general store manager, did you have a particular area, like operations, perishables?

A. No. So the new structure of Hy-Vee is a store director and then there's a store manager right underneath of you. So the store manager oversees the entire store.

Q. So after this restructuring in late 2019/2020, now the structure is store director, correct?

A. Yes.

Q. Then right below that position is store manager, which would have been the old assistant store director?

A. Yes.

Q. And then below a store manager, then you

## Page 31

have the managers of operations, produce, or perishables, those managers?

A. Yes.

Q. And below those you would still have the department managers, correct?

A. Yes.

Q. So no more assistant store directors?

A. No.

Q. And how long were you at the Cottage Grove store as a store manager?

A. Around six months.

Q. What did you do next?

A. Moved back to Kansas City, Belton store director.

Q. When you went back to the Twin Cities, did Aaron go with you?

A. Yes.

Q. What store did he work at?

A. Oakdale.

Q. What position?

A. Produce manager.

Q. In late 2020, correct me if I'm wrong, you both moved and -- is it a daughter?

A. Yes.

Q. So your family then moves to the Kansas

## Page 32

City area, correct?

A. Yes.

Q. And you go to work at the Belton store as the store director?

A. Yes.

Q. Where does Aaron go?

A. Gladstone.

Q. What position did he take at Gladstone?

A. Produce manager.

Q. After becoming the store director at the Belton store, did you have any other positions?

A. My current position.

Q. Which is?

A. District store director, Independence Number 1 and 2.

Q. Now, you say Independence Number 1 and 2. These are two separate stores, correct?

A. Two different stores, yes.

Q. Are you still with the Belton store?

A. No.

Q. So now you are the district store director, meaning you have two stores under your supervision. Is that fair?

A. Yes. That is correct.

Q. Each will have their own separate store

*Emerald Court Reporting, LLC* (913) 383-2400

*www.emeraldcourtreporting.com*

Page 33

directors, correct?
A. No. I am the store director of both of them, but they both have their own store manager.
Q. Okay. So now, instead of just having one store under your directorship, you have another one?
A. That is correct.
Q. You have 1 and 2 in Independence, correct?
A. Yes.
Q. Was that a promotion?
A. Yes.
Q. When did you become the district store director?
A. January of 2022.
Q. And where is your husband currently working?
A. Store manager at Belton.
Q. Who is the store director at Belton?
A. Karla Quandt.
Q. How do you spell that?
A. K-a-r-l-a, Q-u-a-n-d-t.
Q. Was Karla your replacement?
A. Yes.
Q. You've been with Hy-Vee for over almost

Page 34

20 years, right?
A. Over 18, yes.
Q. Over 18 years, yeah. During this time period, have you ever been disciplined within Hy-Vee?
A. Not that I can recall.
Q. I'm sorry?
A. Not that I can recall.
Q. Have you ever -- during this period of time -- strike that.
Currently as the district store director, who do you answer to?
A. So we have what is called regional vice presidents. So I report to a regional vice president.
Q. And who is that?
A. Rob Budd, B-u-d-d.
Q. Now, when you were still the Belton store director, would you also answer to the regional VP?
A. Yes. It was someone different at that time, though.
Q. Who was it at the time?
A. Todd Wagner.
Q. Where is Mr. Wagner currently?

Page 35

A. He is the executive vice president of the south.
Q. Still with Hy-Vee, though, right?
A. Correct.
Q. When did he take that position?
A. Last week.
Q. Very recently.
A. Yes.
Q. And Mr. Budd then replaced him?
A. Yes.
Q. Also last week, correct?
A. Correct.
Q. Do you, as a district store manager, do you go through performance evaluations periodically?
A. Yes.
Q. And that would be conducted by the VP, the regional VP?
A. Are you asking like if my performance is evaluated periodically?
Q. Yes, by --
A. Yes.
Q. As a district --
A. Yes.
Q. You've been district store manager since

Page 36

mid 2022. During this period of time, was your performance evaluated?
A. Yes. Once a year.
Q. And evaluated, the person conducting the evaluation, would that be the VP, the regional VP?
A. Yes.
Q. And did you go through one with Mr. Budd?
A. Not yet. He just got that job. But, yes, I've had them with Todd Wagner previously.
Q. When was the last time that Mr. Wagner conducted a performance evaluation with you?
A. Last December, I believe.
Q. And he would have been also the person to do so when you were the store director at Belton, correct?
A. Yes.
Q. When was the last time he did that while you were at Belton?
A. Typically speaking, the reviews for directors are done in December. So I would say December, roughly.
Q. Is that your recollection of going through that performance evaluation in December

9 (Pages 33 to 36)

*Emerald Court Reporting, LLC*                    (913) 383-2400
*www.emeraldcourtreporting.com*
Case 4:23-cv-00042-GAF    Document 31-2    Filed 12/08/23    Page 5 of 16

Page 65

A. I did.

Q. And were you the person that made the decision not to hire Candace?

A. Yes, that is correct.

Q. And you were also the person to make the decision to hire whomever else you hired, correct?

A. Yes, that is correct.

Q. What were, at that time for the Belton store in particular, what were the floral department manager's job responsibilities?

A. So, I mean, a floral manager is going to take care of customers, take care of employees. They are going to do their ordering for their department. They're going to build displays. They're going to write schedules. Conduct inventory. They are going to take care of different merchandising throughout the store. I mean, that would be like general duties.

Q. And as you've testified, Candace met these requirements, correct?

MS. DEVENEY: Object to form of the question.

BY MR. BARBOSA:

Q. She was qualified to do these job

Page 66

duties, correct?

A. I mean, yes and no.

Q. Well, is it yes or no?

A. Well, I mean, based off of my conversation with her, yes, she was able to design, but she could not articulate management responsibilities. So, yes, she met the qualifications to apply for the job, but...

Q. But according to you, she did not articulate or could not articulate her management responsibilities, is that your testimony?

I don't want to put words in your mouth, so I want to make sure that's what you're saying.

A. I understand. Yes, I mean, there was other -- there would be other factors beyond that, but I don't know that that's your question, so I don't want to improperly answer your question, I guess.

Q. No, I had asked you if based on the list of job responsibilities you gave me for a floral department manager, I had asked you if Candace had the qualifications to do those things, and you said yes and no. And so my question is what you meant by yes and no, and you listed some she did and then you said but she could not

Page 67

articulate her management responsibilities.

A. Right. Based off of the conversation I had with her that day when I interviewed her, no, I did not deem that she could do those things.

Q. And the conversation we're talking about is the interview, correct?

A. That is correct, yes.

Q. Do you know, at that time when you were conducting the interview -- and I think you told us before that prior to that you had no interactions with Candace, correct?

A. Correct.

Q. Did you, at that time during the interview, did you -- were you aware of what she, the candidate Candace, had done for Hy-Vee?

MS. DEVENEY: I want to make sure I understand the question. Did you say with or about her or -- I think the prior testimony was about experience with her.

BY MR. BARBOSA:

Q. Did you understand my question?

A. No. Can you repeat it?

Q. I had asked you earlier if you had known Candace or had any interactions with Candace prior to interviewing her, and you said no, you

Page 68

had not, correct?

A. Correct. With her specifically, no, I had not.

Q. I was asking you at that interview, when you were interviewing Candace, were you aware of what she had done for Hy-Vee at that time?

A. In talking through with her, yes.

Q. But before talking to her, do you know anything, had you asked anyone, or had anyone told you about Candace at all before interviewing her?

A. Yes.

Q. Okay. Let's break that down.

A. Okay.

Q. Who told you about Candace before the interview?

A. Yes, absolutely. So I spoke with Kory Robinson, her store director. I also spoke with Kaitlyn Sehgal, the floral supervisor.

Q. The floral supervisor?

A. Yes.

Q. And so you talked to Kory Robinson, her store director, prior to interviewing Candace, correct?

A. Yes, that is correct.

17 (Pages 65 to 68)

Page 69

Q. What did Kory tell you about Candace?

A. Kory told me that Candace was a very good designer, she had good design experience, but that perhaps her people skills were not great as far as dealing with customers and fellow employees.

Q. That she was a good designer but that her people skills were not --

A. Correct. She had had different customer complaints around her, and she didn't necessarily work well with others.

Q. This is your recollection of the conversation you had with Kory in 2021?

A. That is correct.

Q. What kind of customer complaints did Kory tell you about Candace having?

A. I don't believe that he went into specifics.

Q. When did you have this conversation with Kory Robinson?

A. I do not recall the date.

Q. Was it in relation to the interview? When did you interview Candace?

A. I don't remember the date on like her interview, but like I said, I believe she had put

Page 70

in for the opening a couple of different times, and I would have talked to him the first time that she applied for the position.

Q. And when was that first time that she applied for the position?

A. I'm not for certain.

Q. But you do recall specifically Kory telling you that her people skills were not good?

A. Yes.

Q. Anything else that he may have told you?

A. I don't think so.

Q. What about Kaitlyn Sehgal, what did she tell you about Candace?

A. So her remarks were pretty mirrored up with Kory's, that she possessed great design talent, but she did not -- she's not the best people person and just didn't have an awesome attitude.

Q. And that was based on what, do you know?

A. I can't speak on behalf of Kaitlyn, but I would assume her interactions with her.

Q. And when did you have a conversation with Kaitlyn?

A. It would have been around the same time as my conversation with Kory.

Page 71

Q. But you don't know?

A. I don't, I'm sorry.

Q. Did Kaitlyn tell you anything else about Candace?

A. Huh-uh. No.

Q. In any event, you said this would have been at or around the first time that Candace applied for the position, correct?

A. Yes, that is correct.

Q. Besides talking to Kory Robinson or Kaitlyn Sehgal, did you look at any records and search any information about Candace prior to the interview?

A. No.

Q. At the interview, you were aware, however, that she had applied for that position at least two more times before that, correct?

A. Yes.

Q. As you sit here today, and includes the time -- strike that.

At the interview, were you also aware she had applied for a similar position within Hy-Vee's store structure?

A. At the time of the interview?

Q. Yes. At the time of the interview, were

Page 72

you aware -- I know you've told us that you were aware she had -- at the time of the interview, you were aware she had applied at least twice to the Belton position, correct?

A. Yes. Correct.

Q. I'm asking you at the time of the interview, were you also aware that Candace LaPlant had applied for a floral department manager at other Hy-Vee stores?

A. In talking to her, yes, I knew that that she told me she had applied, I don't know when, but at a different time period prior to me talking to her, but as far as like around that time frame, no.

Q. Kory Robinson didn't tell you?

A. I don't think so. I don't recall that.

Q. Kaitlyn Sehgal didn't tell you?

A. I do not recall that, no.

Q. By the way, is Kaitlyn Sehgal still with Hy-Vee?

A. She is not.

Q. Is Kory Robinson still with Hy-Vee?

A. Yes, he is.

Q. Where is he?

A. He's the regional vice president over

18 (Pages 69 to 72)

Page 73

Illinois in the quad cities.

Q. Do you know where Kaitlyn is? I know she --

A. No, I do not. Sorry to interrupt. No, I do not know where she is.

Q. During the interview, did you become aware that Candace had been a floral department manager at a different employer?

A. Yes. That would have been on her application as well.

Q. As part of your interview process, did you ever contact her previous employer to determine what kind of job she had done as a floral department manager?

A. No.

Q. As we sit here today, are you aware that plaintiff complained of being discriminated based on her age by Hy-Vee? Are you aware of that?

A. Yes, I am.

Q. When did you first become aware of that?

A. I don't -- I don't know. I feel like it's been awhile now.

Q. Who told you or how did you become aware?

A. I believe legal counsel for Hy-Vee.

Page 74

Q. Excluding legal counsel, did anyone within Hy-Vee talk to you about Candace's complaints of age discrimination?

A. No.

Q. After learning about it, did you do anything?

A. No.

MR. BARBOSA: Glenda, this is the moment I'm going to want to share my screen. I just don't want to mess it up. Let's try this.

(Off-the-record discussion.)

BY MR. BARBOSA:

Q. Is my screen being shared?

A. Yes.

Q. Ma'am, I'm showing you, very very bottom, do you see HV000595? Do you see that?

A. Yes.

Q. I'll represent to you this is one of the documents that was produced by Hy-Vee in this case, and it illustrates -- first and foremost, have you ever seen this document?

A. I don't believe so.

Q. I know you haven't seen this before, but do you know what this document represents? Are you familiar with similar documents?

Page 75

A. Yes. So it looks like the -- it would have been the old style of cover letter on our applicant list providing names, application date, job, store, like the opening and closing date of the positions.

Q. Do you understand this to be a list of individuals that applied for the position of floral department manager at the Belton store when you were the store director there?

MS. DEVENEY: Objection. Foundation.

A. Yes. You say a list that represents who put in for the openings?

BY MR. BARBOSA:

Q. Yes. Is that your understanding, when you look at it, do you understand this to be a list of individuals who applied for the floral department manager at the Belton store in 2021?

A. Yes, sir.

Q. And I want to ask you, again, quickly to tell us, if you know, there's this column right here. You see my cursor?

A. Mm-hmm. Yes.

Q. "Jpo_OpenDate," do you see that?

A. Yes.

Page 76

Q. And "jpo_CloseDate," do you see that?

A. Yes.

Q. What is the jpo open date and close date? What does that mean?

A. It would mean the opening date of the position. So the date we opened it and then the other one would be the closing date, the date that the position closed.

Q. And then if we go, the "apo_ApplyDate," that would show the date the particular individual applied for the position. Is that fair?

A. I believe so, yes.

Q. And at the left side are the names of the individuals. True?

A. Yes.

Q. And we have LaPlant-Turner, Candace. Do you see that?

A. Yes.

Q. And it shows she would have applied on January 25th, 2021, at 18:03.

A. Yes, I see that.

Q. Are we to understand that's when she would have submitted her application for that particular position, correct?

*Emerald Court Reporting, LLC*                    (913) 383-2400

*www.emeraldcourtreporting.com*

Page 77

A. I do believe so, yes.

Q. And at that time, and based on the jpo open date, it shows that the job was open on February 25th, 2021, at midnight, 0000 hours. Do you see that?

A. I do see that. I don't know that -- I don't know that that means it opened at midnight, but yes.

Q. Well, I was going to ask you that. All of them have the same hours, both for the open and end date. Is that just a default, do you know, number?

A. Yeah.

Q. But in any event, you would agree that she applied on the same date that the job was open, correct?

A. It does look that way, yes.

Q. So it was, I believe, at least this Suzie McGraw individual also applied that same day. Do you see that?

A. Yeah, I do see that.

Q. And after that, we have Rebecca, and I may mispronounce the names, but Shaylan, Cassandra, Angela, and Chaundra, I believe, applied for that job before it was closed on

Page 78

March 4, 2021. Do you see that?

A. I do see that.

Q. Was the job fulfilled, the position fulfilled on March 4, 2021?

A. So for that particular opening, the job offer was provided to Shaylan Mitchell, and she did not accept the position, and that led to the position being reopened.

Q. Okay, and I appreciate your answer. That was not quite my question.

A. I apologize.

Q. My question was specifically to did the position -- was the position filled on March 4, 2021?

A. No, because she did not accept the position.

Q. Oh, so you can make an offer to someone, but if she doesn't accept it, the position remains open, correct?

A. No. We have to reopen the position.

Q. The position remains unfilled, correct?

A. Correct. Yeah.

Q. And your testimony is that the job was offered to Shaylan Mitchell?

A. Yes.

Page 79

Q. But she did not accept the job?

A. Correct.

Q. Why did she not accept the job? She applied for it just a few days before, about a week or so before. Why did she not accept the job, do you know?

A. Yes. So she was -- she was at the time a Hy-Vee employee in Jefferson City, Missouri. She was prepared to move to Kansas City, and then I believe something happened and she could no longer move to Kansas City, so she declined the offer.

Q. And then the position was reopened on March 10th, according to this document. Do you see that?

A. Mm-hmm. Yes, I do.

Q. And, again, you have several people that applied for that job once it reopened, okay, including Suzie McGraw, Candace LaPlant, Mikah Scott, Chaundra Scott Keearns. If I mispronounce her name, I apologize. Do you see those?

A. Yes, I do.

Q. And the position was opened on March 10th and closed on March 17th. Do you see that?

A. Yes, I do.

Page 80

Q. On March 17th was the position filled?

A. Yes. I don't know that it would have been on that exact date, but it was filled after that job posting closed, yes.

Q. Well, I mean, you closed the job -- you closed the job on March 17th, correct?

A. Yes. That's the day that the last applications would come in, yes.

Q. Well, where do you see that? Where do you see a deadline for applications to come in?

A. That's the job close date. Job close is the deadline for applications to come in.

Q. Okay.

A. So job close means it would be the last day it's visible to anybody on like the internet to apply for.

Q. So the job closed on the 17th of March, you had another group or set of candidates. My question to you was, between March 17th, because then we see the position was reopened on May 21, so from March 17th, after that March 17th or on March 17th, was the position filled?

A. Yes.

Q. And who filled it?

A. Chaundra Scott Keearns.

*Emerald Court Reporting, LLC*

*(913) 383-2400*

*www.emeraldcourtreporting.com*

Case 4:23-cv-00042-GAF    Document 31-2    Filed 12/08/23    Page 9 of 16

Page 81

Q. And Chaundra got the job as the department manager, correct?

A. Yes, that is correct.

Q. And what happened to Chaundra? because the position became open again on May 21st. What happened?

A. So I don't recall the exact series of events that led to her departure from Hy-Vee, but I believe she stopped showing up to work.

Q. And when did she stop showing up to work?

A. I'm not for certain.

Q. It would have been before May 21st when -- that the store posted the job again, correct?

A. Yes, that is correct.

Q. And by the way, who goes about determining the deadline for a job to be open or closed? Is that the store director?

A. It can be. It could also be the HR manager. They're the ones posting the positions, generally speaking.

Q. But do they get directions from the store director on what to do?

A. They can, yes. Typically a department

Page 82

manager position is a seven-day job posting, typically.

Q. In this case, do you recall whether you were telling the HR what to do as far as the posting opening and closing of this position?

A. No, I do not recall.

Q. But Chaundra stopped coming to work, so necessitating you reposting the job, correct?

A. Yes, I believe so.

Q. And the job was opened on May 21st, correct?

A. It appears that way, yes.

Q. And you had a third set of candidates that submitted applications for the job, correct?

A. According to this, yes, it appears that way.

Q. Going back, I believe on the first time when the job was opened and you offered the job to -- was it Shaylan Mitchell?

A. Yes.

Q. Did you interview those individuals?

A. Are you asking did I interview for floral manager?

Q. Let's start with Shaylan Mitchell. Did you interview her for the job of floral

Page 83

department manager?

A. Yes, I did.

Q. And she's the one you offered the job, and she said no, correct?

A. Yes, that is correct.

Q. Do you know how the interview was conducted? Was it in person? Was it over the phone? Zoom?

A. It was in person.

Q. And of the group of people that had applied for that first time -- Chaundra, Angela, Cassandra, Shaylan, Mikah, Suzie, Candace -- how many of those people had you actually interviewed?

A. I do not recall.

Q. You did not interview Candace LaPlant, however, correct?

A. No, I did not.

Q. Do you recall if you interviewed Suzie McGraw?

A. I do not.

Q. Rebecca Gerant?

A. I do not recall.

Q. Cassandra Maslowski?

A. No, I do not recall.

Page 84

Q. Angela Elsbury?

A. No, I do not recall.

Q. Chaundra Scott Keearns?

A. I don't recall on that one either.

Q. But you do recall interviewing Shaylan Mitchell, correct?

A. Yes, that is correct.

Q. When the position was reopened on March 10th, from the group of people that interviewed, you hired Chaundra, correct?

A. Yes.

Q. Did you interview Chaundra?

A. Yes, I did.

Q. And did Chaundra at that time articulate to you managerial responsibilities and skills?

A. Yes, she did.

Q. Sufficiently enough for you to hire her, correct?

A. Yes, that is correct.

Q. For only to have her stop coming to work a few weeks later, correct?

A. Yes.

Q. Did you interview any other individual on that list? Let's start with Mikah Scott. Did you interview Mikah?

21 (Pages 81 to 84)

Emerald Court Reporting, LLC                    (913) 383-2400
www.emeraldcourtreporting.com
Case 4:23-cv-00042-GAF    Document 31-2    Filed 12/08/23    Page 10 of 16

Page 93

A. I do not remember, no.
Q. Do you know -- but you do remember interviewing her. True?
A. Yes, I do. Yes.
Q. Do you know where the interview was conducted?
A. My office.
Q. And that would have been at the Belton store?
A. Yes, that is correct.
Q. Based on your recollection, how long do you think the interview took?
A. 45 minutes to an hour.
Q. 45 minutes to an hour?
A. Yes.
Q. Is that your independent recollection or based on documents you reviewed in preparation of the deposition today?
A. Based on the document.
Q. So based on the document you reviewed, you say it lasted 45 minutes to an hour; is that true?
A. Yes.
Q. And during that 45 minutes to an hour interview, what did you discuss?

Page 94

A. It would have been a standard interview. So we would have talked about job history leading up to that day. We would have talked about different things as far as customer service is concerned. How to handle situations with employees or customers that might be upset. What customer service means to that individual.
We would have talked -- talked about job history, experience. We talked about, you know, training that she was in the process of receiving from her existing manager. And then she provided a lot of negative feedback about her existing manager and her previous manager during that conversation.
Q. So, again, you started by saying it would have been a typical interview and topics that a typical interview usually covers, and then mixed with that some specifics -- specific things, I assume, based on the testimony you actually discussed. So I want to, if it would be possible, I want you to tell me exactly what topics you recall discussing, not what a general interview would cover, but specifically as to Candace back in 2021, can you tell the members of the jury what you and Candace discussed during

Page 95

her interview?
A. Yes.
Q. What was it?
A. We talked job history. We talked about, again, how her existing manager, Katie, was in the process of training her to become a manager and diving into questions about what she knew we -- I mean, she talked about like inventory. Well, she had counted inventory, but there's far more that goes into inventory than just counting.
So not a lot of like deep dives into that managerial aspect. Schedule, had not written the schedule. She had talked about her previous leadership, which was an individual named Mandy, and it was just absolute negativity surrounding Mandy and how she was not a good leader, and they just did not -- they did not get along.
Q. Anything else?
A. In it she talked about -- again, it was a lot of negativity in the conversation.
Q. Job history, when you talk about -- well, you talked about job history. You talked about her history. With ex-employment history?
A. Ex-employment history.

Page 96

Q. At Hy-Vee or anywhere else?
A. My question would have been tell me about your job history leading up to today. So, I mean, whatever she would have disclosed at the time.
Q. Did she, at that time, disclose to you that she had previously been a floral department manager?
A. Yes, I believe so. It was also on her application.
Q. Did she also at that time disclose to you how long she had been with Hy-Vee?
A. I -- I can't say for certain.
Q. Was that something that would have been on her application as well?
A. Yes.
Q. You said that you talked about her current manager, Katie. Do you know Katie's last name?
A. I do not.
Q. Was she talking negatively about Katie during this interview?
A. Yes.
Q. What negative things did she say about Katie?

24 (Pages 93 to 96)

Page 97

A. I believe it was -- it was in regards to teaching her different things in the department, that they were in the process of working on it, but that she had -- it was going to be taught but maybe wasn't taught. That was the main thing about Katie. Most of the negative comments came around Mandy.

Q. We'll talk about Mandy in a second. About her manager, current manager Katie, specifically what negative things did she say?

A. I mean, as I stated, the lack of like maybe teaching her what -- like to be a floral manager, I guess. I'm not -- go ahead, I'm sorry.

Q. Do you recall what exactly she said about Katie not teaching her?

A. No. Verbatim, no, I do not recall.

Q. You said you talked about inventory. Did she tell you that she participated or done inventory?

A. Yes, but she stated that she had only counted inventory. But as I said, there's a lot of other processes involved in inventory beyond just the counting of the product.

Q. Like what?

Page 98

A. So as a floral manager, they are counting their inventory, yes, but they're making sure that all of their costs are up to date on their inventory sheets. They're making sure that all of that information is input into the system correctly. They are making sure that all of their invoices are paid and accounted for in their inventory. They're keeping a sales to purchase ledger. There's, again, just a lot of aspects to inventory beyond just counting.

Q. And did she tell you she could not do the other things?

A. Yes, I do believe so. Yes.

Q. Well, did she tell you or do you believe she did?

MS. DEVENEY: Did you say could not or did not?

BY MR. BARBOSA:

Q. Could not.

A. Yes.

Q. The only thing she could do in inventory was count, is that what she told you?

A. Yes.

Q. You know you're under oath, right?

A. Yes, sir.

Page 99

Q. You also talked -- I believe you said about schedule. Is that scheduling of other employees?

A. Yes.

Q. What did she tell you about scheduling?

A. I do not recall.

Q. And then you said that she also talked about a previous manager named Mandy. Do you know what Mandy's last name is?

A. I do not.

Q. What negative things she said about Mandy?

A. She had talked about just that Mandy wasn't ready for that position and that she wasn't a good floral manager, and she was not good at that job. I believe she ended up leaving that job, but just all around that she was not -- she was not good for the position.

Q. Well, did you know this Mandy that she was talking about?

A. I knew of her, but I did not know her.

Q. Did you know, one way or the other, what Candace may have been telling you about Mandy, whether that was true or untrue?

A. No.

Page 100

Q. So how do you determine that could be negative if someone is just basically telling her true experience with that person?

A. Yeah, so, the conversation just turned to like -- it was all just negative. There's -- it just seemed like there was a hatred towards this individual, and when you're looking to fill a leadership position, you're looking for someone who is going to -- you deem to be able to get along with your employees and take -- just a positive individual, and that was not at all my experience in talking to her.

Q. What did Candace tell you to give you the -- to make you conclude that what she was doing was a lot of hatred? What specifically did she say to you to make you believe that?

A. There was just nothing positive that came out of her mouth. It was all negativity --

Q. About Mandy?

A. -- nothing positive. Yes.

Q. About Mandy?

A. Yes.

Q. Give me an example of what she said that was all about negativity. You've talked about Mandy not being a good manager.

*Emerald Court Reporting, LLC* (913) 383-2400
*www.emeraldcourtreporting.com*

Page 101

A. Mm-hmm. I do not recall specifics. I just know it was all negative.

Q. You would agree with me that Chaundra leaving her job and never showing up would be an example of someone who is not a good manager, wouldn't you?

A. Yes.

Q. And if someone was to tell you that, would you deem that to be hatred?

MS. DEVENEY: Objection. Argumentative.

A. I mean, no, not necessarily.

BY MR. BARBOSA:

Q. If someone was to tell you that Chaundra was not a good manager, would you deem that to be negative?

MS. DEVENEY: Objection. Form of the question.

A. Yes, I would deem it to be negative.

BY MR. BARBOSA:

Q. Even though it's true?

A. Yes.

Q. Anything else that you recall Candace telling you during her, as you testified, 45 minute to an hour interview?

Page 102

A. The only other thing that comes to mind was the fact that I believe she put in for a position with Jeff Sesker at that store at one point in time, and he did not select her for that position, and he said that he should have selected her for that position. That's the only other thing I recall.

Q. If Candace LaPlant-Turner, based on her testimony, recalls this interview with you to be significantly shorter, about 15 minutes long, would you have any reason to doubt that testimony?

A. Yes.

Q. Because you're pretty sure it was 45 minutes to an hour. True?

A. Yes.

Q. Even though you don't recall the date the interview occurred, correct?

A. Correct.

Q. The time that the interview occurred, correct?

A. Correct.

Q. And you don't even recall if you interviewed other candidates during that period of time, correct?

Page 103

MS. DEVENEY: Objection. Misstates testimony.

A. I know that I interviewed her and Raejean for the opening.

BY MR. BARBOSA:

Q. Yes, but if we look at this document being displayed to you, there are more than two candidates on it, correct?

A. For different job postings, yes.

Q. And with the exception of Raejean, Candace, and Chaundra, you had testified earlier you don't recall interviewing anyone else. Is that true?

MS. DEVENEY: Objection. Misstates the testimony.

A. No. I stated at the very first opening, the job opening on 2/25 that I interviewed Shaylan Mitchell.

BY MR. BARBOSA:

Q. I apologize, you did say so. With the exception -- I'll rephrase the question.

With the exception of Candace, Shaylan, Chaundra, and Raejean, you testified earlier you don't recall interviewing anyone else. Is that true?

Page 104

A. That is true.

Q. After the interview, how soon after you interviewed Candace LaPlant-Turner did you make a determination you were not going to hire her? How soon after the interview?

A. Repeat that one more time, please.

Q. How soon after you interviewed Candace did you decide that you were not going to interview her -- I'm sorry, did not want to hire her?

A. I do not recall.

Q. And I think you would agree she applied two other times. And is it your testimony the reason you had not interviewed her before is based on what her store manager had told you, Kory Robinson had told you, that she did not have people skills? Is that the reason you had not interviewed her?

A. Yes. Based off of what Kory and Kaitlyn both provided to me, which was nearly the same account, yes, that is true.

Q. What changed from those accounts that you testified to now in early June or any time around that when you then decided to interview her? What changed?

26 (Pages 101 to 104)

Case 4:23-cv-00042-GAF    Document 31-2    Filed 12/08/23    Page 13 of 16

Page 105

A.   The applicant listing.

Q.   What do you mean by the applicant listing?

A.   I would say the lack of applicants led me to interview her.

Q.   Well, I mean, she, on the first batch of applicants, she was about, if we count -- one, two, three, four, five -- six people that applied on that first -- or seven, I'm sorry, on that first batch of applicants until it was closed on March 4.  Do you see that?

A.   Yes, sir.

Q.   You didn't interview her then, right?

A.   That is correct.

Q.   We know you interviewed Shaylan, but you don't recall interviewing anyone else, correct?

A.   Correct.

Q.   Then on the 2nd we have, starting on March 10th, we have -- one, two, three -- four individuals applying.  You interviewed Chaundra, but you don't -- you didn't interview Candace again and you don't recall interviewing Mikah or Suzie, correct?

A.   That is correct.

Q.   And then the last, you have Suzie,

Page 106

Kylei, Candace, Frances, and you now interviewed Candace, but you don't recall interviewing Frances, Kylei, or Suzie, correct?

A.   Correct.

Q.   And then you don't recall it this way, but there was a fourth opening and closing of this position where there's two individuals applying, and you interviewed Raejean, but you don't recall interviewing Vickie.  Is that true?

A.   That's correct.

Q.   So, again, it's your testimony that the only reason you interviewed Candace in June would have been because there weren't other candidates to interview?

MS. DEVENEY:  Objection.  Form of the question.

Go ahead.

A.   I should rephrase it as --

BY MR. BARBOSA:

Q.   Is your testimony --

A.   Lack of candidates.

Q.   I'm sorry, I thought you asked me to rephrase it.

A.   Oh, no, no.  I said I should rephrase it.  I apologize.  Lack of candidates with floral

Page 107

experience led me to interviewing her.

Q.   And I asked you again how soon after you interviewed her that you decided you were not going to hire her?

A.   I am not sure.

Q.   I'm showing you what's been -- at the bottom HV 00617.  Do you see that?

A.   Yes.

Q.   I represent to you it's an email.  It's from Kory Robinson and it's to HR manager and then there's an Andrew Batliner.  Do you see that?

A.   Yes.

Q.   Subject, Ron Turner.  Do you see that?

A.   Yes, I do.

Q.   Have you seen this email before?

A.   I'm not sure.

Q.   Do you recognize this email to be an internal email exchange between people working at Hy-Vee?

A.   Yes.  It would have been internal between Kory, the store director, to his HR manager and to his store manager.

Q.   And Kory -- this is the individual that you claim told you Candace was not a good hire

Page 108

because she lacked people skills, right?

MS. DEVENEY:  Objection.  Form of the question.

BY MR. BARBOSA:

Q.   This is the same Kory?

A.   Yes, that is the same Kory.  Yes.

Q.   So in this email that he's sending to his HR manager and to Andrew Batliner -- who is Andrew?

A.   He would be the store manager.

Q.   At the Lee's Summit 1?

A.   Yes.  He was at the time.  He is no longer at that location.

Q.   This email is dated June 17, 2021.  Your understanding that Candace worked at Lee's Summit 1 at the time, correct?

A.   Yes, sir.

Q.   So it reads, "So.... Whitney declined to hire Candace."

Did I read that correctly?

A.   Yes, sir.

Q.   Is Whitney referred there, is that you?

A.   Yes.

Q.   It then says, "Her HR manager sent the declined email to her, maybe not the best route

27 (Pages 105 to 108)

Case 4:23-cv-00042-GAF    Document 31-2    Filed 12/08/23    Page 14 of 16

## Page 117

"I asked Gina, my HR manager, to call and let the two applicants I interviewed but didn't select that we did go with a different applicant."

I thought earlier that you said that HR, in emailing, was doing just what she was told to do, email the people that were not hired. Isn't that your testimony?

**A. I did say that, but I said that she was advised by the HR supervisor that's how she practices that. I didn't say I advised her to do that.**

Q. But here you're telling Mr. Wagner that you asked Gina to call and let the two applicants know. Isn't that what you said here?

**A. Yes, sir, that's what I'm saying there, but I also said that she emailed them based off of what she had been advised to do.**

Q. So is your testimony or recollection here that once you interviewed Candace, you told the HR manager to call her and tell her she didn't get the job; is that your testimony?

**A. According to this email, yes.**

Q. Do you recall telling her, to telling Gina, call Candace and tell her she didn't get

## Page 118

the job?

**A. No, I do not personally recall that.**

Q. You then say, "She was always advised to send the email though."

Again, do you know who always advised Gina to send the email?

MS. DEVENEY: Objection. Asked and answered.

**A. HR supervisor. Molly's name is listed next. Molly was the HR supervisor at the time.**

BY MR. BARBOSA:

Q. "Molly confirmed this," meaning that Gina was always advised to send an email?

**A. Yes, that is correct.**

Q. "So Gina sent an email rather than calling."

Did I read that correctly?

**A. Yes.**

Q. "I have since tried to call Candace, LS1 employee, she did not answer, I left a voicemail. I don't feel like I need to call her husband though and explain why I didn't hire his wife. I went with the candidate that I felt was the best fit for my store and the job."

That candidate you were talking about is

## Page 119

Raejean, correct?

**A. Yes, that is correct.**

Q. Earlier we talked about the qualifications for the job, the job duties. Had Raejean ever been a manager, a store department manager before?

**A. No, I do not believe so.**

Q. Had Raejean ever worked in the floral department before you hired her as the department manager?

**A. Yes.**

Q. How old was Raejean when you hired her?

**A. I do not know.**

Q. Had Raejean been on maternity leave prior to you hiring her?

**A. At some point in time she was on maternity leave.**

Q. I'm asking specifically, before you hired her, had she been on maternity leave?

**A. I don't know the proximity of when she was on leave to when she came back.**

Q. Isn't it true that she had just returned from maternity leave when you decided to hire her?

**A. I'm not sure of the date that she**

## Page 120

returned from maternity leave.

Q. I know you're not sure of the exact date, but I'm asking, had she not returned from maternity leave soon before you promoted her to the floral department manager?

**A. I'm not sure of the timeline.**

Q. But this would be something that would be in the records, correct?

**A. I would assume so.**

Q. Easily ascertainable, correct?

**A. I can't say for certain.**

Q. How long did Raejean do the job as a floral department manager at your store in Belton?

**A. I am not sure. I departed Belton in December of 2021, and she was still there when I left.**

Q. Before you left the store, was there any issues, problems with Raejean and her managerial style and qualifications?

**A. Not sure that anything specific comes to mind.**

Q. Did she do a good job?

**A. I mean, I felt like she was doing a good job. You have challenges with a lot of new**

*Emerald Court Reporting, LLC*                    *(913) 383-2400*

*www.emeraldcourtreporting.com*

Page 133

CERTIFICATE

I, Glenda Moeller, a Certified Court Reporter of the State of Missouri and of the State of Kansas, do hereby certify that:

Prior to being examined, the witness was first duly sworn;

Said testimony was recorded stenographically by me in shorthand at the date and location hereinbefore stated and was thereafter transcribed under my direction;

The foregoing transcript is the true, correct, and complete record of the testimony given by said witness;

I am not a relative, employee, attorney, or counsel of any of the parties or a relative or employee of such attorney or counsel nor financially interested in the action.

Witness my hand and seal this 29th day of October, 2023.



Glenda Moeller
Certified Stenographic Court Reporter
KS #1294, MO #962

34 (Page 133)

Case 4:23-cv-00042-GAF    Document 31-2    Filed 12/08/23    Page 16 of 16