# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

CANDACE LAPLANT-TURNER, )
)
        Plaintiff, )
)
vs. )     Case No. 23-00042-CV-W-GAF
)
HY-VEE, INC., )
)
        Defendant. )

## ORDER

Now before the Court is Defendant Hy-Vee, Inc.'s ("Defendant" or "Hy-Vee") Motion for Summary Judgment on Plaintiff Candace LaPlant-Turner's ("Plaintiff") one-count complaint. (Doc. 30). Plaintiff opposes. (Doc. 38). Defendant has also filed a reply brief. (Doc. 39). For the following reasons, Defendant's Motion for Summary Judgment is GRANTED.

## DISCUSSION

### I. FACTS[1]

### A. Plaintiff's Background

Plaintiff was born in 1961. (DSOF, ¶ 1; PRDSOF, ¶ 1). Before working for Hy-Vee, Plaintiff worked at a different grocery store, Larry's IGA a/k/a Apple Market ("IGA/Apple Market"). (DSOF, ¶ 2; PRDSOF, ¶ 2). Plaintiff worked at IGA/Apple Market for 21 years, with the last ten years as the manager of the Floral Department. (DSOF, ¶ 3; PRDSOF, ¶ 3). In that role, she handled the ordering, plants, flowers, inventory, billing, designing, and anything else that needed to be done. (DSOF, ¶ 4; PRDSOF, ¶ 4). She also oversaw two designers and two clerks.

---

[1] The following acronyms are used: (1) "DSOF" for Defendant's proposed statements of facts, located at Doc. 31, pp. 1-16; (2) "PRDSOF" for Plaintiff's responses to Defendant's proposed statement of facts, located at Doc. 38, pp. 1-13; (3) "PSOF" for Plaintiff's proposed statement of facts, located at Doc. 38, p. 14; and (4) "DRPSOF" for Defendant's responses to Plaintiff's proposed statement of facts, located at Doc. 39, p. 10.

(DSOF, ¶ 5; PRDSOF, ¶ 5).

**B.     Hy-Vee's Organizational Structure**

During the relevant period, each Hy-Vee store had a Store Director or District Store Director who oversaw all operations at each store.  (Doc. 31-2, 29:18-31:6; Doc. 31-3, ¶ 4).  Most stores also had a Store Manager, which is the position directly below the Store Director on Hy-Vee's organizational chart.  (*Id.*).  Most stores (including those where Plaintiff worked) also had "Mangers Of," who were upper-level managers.  (*Id.*).  For example, the Manager of Perishables oversaw the perishable departments in the store, and the Manger of Store Operations oversaw the front end of the store.  (*Id.*).  Each store also had department managers, including a manager of the Floral Department.  (DSOF, ¶ 7; PRDSOF, ¶ 7).

Additionally, Hy-Vee employed department supervisors, who oversaw the operations of a particular department at numerous stores in a geographical region.  (DSOF, ¶ 8; PRDSOF, ¶ 8).  For example, a Floral Supervisor oversaw the operations of Floral Departments in a region.  (*Id.*).  Floral Supervisors did not directly manage employees, but they worked with the Floral Departments in their regions and often became familiar with Floral Department employees in those stores.  (DSOF, ¶ 9; PRDSOF, ¶ 9).

From July 2018 to January 1, 2022, Kaitlyn Sehgal was the Floral Supervisor for the Southern Region, which consisted of approximately 35 stores including all stores in Kansas and Missouri.  (DSOF, ¶ 10; PRDSOF, ¶ 10).  As the Floral Supervisor, Sehgal helped train new managers, stepped in when there were floral emergencies, helped and supported the Floral Departments in her stores, answered questions, and aided with staffing situations.  (DSOF, ¶ 11; PRDSOF, ¶ 11).  She also oversaw remodels, ordered equipment for those remodels, helped to set up remodels, and participated in grand openings.  (DSOF, ¶ 12; PRDSOF, ¶ 12).

### C. Floral Manager Position

Plaintiff agrees that the Floral Manager job description accurately describes the position. (DSOF, ¶ 13; PRDSOF, ¶ 13). The first duty listed in the job description reads: "Maintains a positive attitude; creates an atmosphere of friendliness and fun through flexibility and teamwork. Generates a friendly atmosphere by encouraging employees to greet and speak to customers; providing prompt, courteous, and efficient service to customers and sets a good example." (DSOF, ¶ 14; PRDSOF, ¶ 14). The education or experience preferred for the position is a high school education or three years of related work experience. (DSOF, ¶ 15; PRDSOF, ¶ 15). Candidates must be able to solve practical problems, to handle variables with limited standardization, and to interpret instructions. (DSOF, ¶ 16; PRDSOF, ¶ 16). There are also physical requirements of the position. (*Id.*).

According to Plaintiff, the main difference between the designer position and the manager position are that the manager: (1) handles the ordering; (2) handles the scheduling; (3) is responsible for inventory; (4) has overall responsibility for profit and loss; (5) is responsible for coaching and disciplining employees; and (6) must maintain a general awareness of how the department is doing and motivate employees to do things the Hy-Vee way. (DSOF, ¶ 17; PRDSOF, ¶ 17). Plaintiff agrees it is important to be flexible and good with people—both customers and employees. (DSOF, ¶ 18; PRDSOF, ¶ 18).

Compared to IGA/Apple Market, the Hy-Vee Floral Departments handle significantly more business with approximately the same number of employees. (DSOF, ¶ 19; PRDSOF, ¶ 19).

### D. Plaintiff's Employment at Hy-Vee

Plaintiff began working for Hy-Vee in March 2012 as a part-time designer at the Lee's Summit #2 store. (DSOF, ¶ 20; PRDSOF, ¶ 20). Plaintiff applied to work at three Hy-Vee stores:

Lee's Summit #1; Lee's Summit #2; and Belton. (DSOF, ¶ 21; PRDSOF, ¶ 21). She interviewed with and received offers from both Lee's Summit #2 and Belton. (*Id.*). Plaintiff chose to go to Lee's Summit #2, rather than Belton, because the then-Floral Manager at the Belton store did nothing but talk the store down whereas the Floral Manager at Lee's Summit #2 talked the store up. (DSOF, ¶ 22; PRDSOF, ¶ 22). Plaintiff decided she would rather work at a store where the Floral Manager was positive about the store. (*Id.*). Plaintiff stayed at Lee's Summit #2 as a floral designer until November 2018, when she moved to Lee's Summit #1. (DSOF, ¶¶ 23-24; PRDSOF, ¶¶ 23-24). She worked at Lee's Summit #1 as a floral designer until she resigned in July 2023. (DSOF, ¶ 24; PRDSOF, ¶ 24).

Plaintiff signed a "Friendliness and Customer Service Contract" when she was hired and agrees that friendliness and customer service are both emphasized at Hy-Vee. (DSOF, ¶ 25; PRDSOF, ¶ 25). She further agrees these are both important qualities in a manager. (*Id.*).

### 1. *Plaintiff's Duties as a Floral Designer*

During her Hy-Vee employment, Plaintiff ordered product when a need arose, but she was never the person who regularly ordered products. (DSOF, ¶ 26; PRDSOF, ¶ 26). Plaintiff handled the inventory on one occasion when she worked at Lee's Summit #2 (between 2012 and 2018). (Doc. 31-1, 126:13-23). Otherwise, she sometimes helped with counting product but did not handle the other duties associated with inventory. (*Id.*). Those additional duties included: making sure the costs are up to date for all product on the inventory sheets; making sure the information in the system matches; making sure all invoices are paid and linked to the product; and keeping a sales-to-purchase ledger. (Doc. 31-2, 97:18-98:13). Plaintiff never handled any of the scheduling during her Hy-Vee employment. (DSOF, ¶ 29; PRDSOF, ¶ 29). Plaintiff helped train clerks how to design floral arrangements but otherwise did not handle any employee hiring, coaching, or

4

discipline. (DSOF, ¶ 30; PRDSOF, ¶ 30). Plaintiff was never responsible for the profit and loss of the department. (DSOF, ¶ 31; PRDSOF, ¶ 31). During her deposition, Plaintiff was asked, "Any other duties that you would consider to be management duties, did you do any others that we have not covered while you were at Hy-Vee?" to which she responded, "I don't believe so." (Doc. 31-1, 70:20-24).

### 2. *Kory Robinson's Observations of Plaintiff*

Kory Robinson became the Store Director at Lee's Summit #1 in October 2019 and held that position until April 2022. (DSOF, ¶ 33; PRDSOF, ¶ 33). During his time as Store Director at Lee's Summit #1, Robinson interacted with Plaintiff on a regular basis and received feedback from Plaintiff's manager. (DSOF, ¶ 34; PRDSOF, ¶ 34). Plaintiff agreed that Robinson would be in a decent position to evaluate her performance, abilities, skills, and opportunities. (Doc. 31-1, 24:6-10). In Robinson's observation, Plaintiff was an excellent designer, but she often struggled with interpersonal communications. (DSOF, ¶ 36; PRDSOF, ¶ 36). He believed she tended to resist changes in the store and had trouble handling curveballs. (*Id.*). He also stated Plaintiff often bickered with her manager and tended to be abrasive. (*Id.*).

Robinson also received, directly or indirectly, a fair number of customer complaints about Plaintiff's communication style. (DSOF, ¶ 37; PRDSOF, ¶ 37). For example, in January 2020, a customer sent an email to Hy-Vee's Customer Care Department. (DSOF, ¶ 38; PRDSOF, ¶ 38). In the email, the customer reported that Plaintiff had treated his fiancé rudely on more than one occasion. (*Id.*). He stated his fiancé had recently called the store because they had planned to use the store to provide flowers for their wedding, but because Plaintiff was so rude, they decided to call a different store and planned never to shop at Lee's Summit #1 again. (*Id.*).

### 3.     *Kaitlyn Sehgal's Observations of Plaintiff*

As noted above, Kaitlyn Sehgal was the Floral Supervisor over the Kansas City stores from July 2018 to January 1, 2022.  (DSOF, ¶ 39; PRDSOF, ¶ 39).[2]  Before becoming the Floral Supervisor, Sehgal had been a Floral Manager for approximately four years at two different stores, so she had a good understanding of the qualities and skills required to be a Floral Manager.  (DSOF, ¶ 43; PRDSOF, ¶ 43).  Based on her observations, Sehgal believed Plaintiff did not have the qualifications to successfully perform the job duties of a Floral Manager.  (Doc. 31-4, 44:16-21).

Sehgal worked with Plaintiff when Plaintiff worked at Lee's Summit #2, when that store was undergoing a remodel.  (DSOF, ¶ 40; PRDSOF, ¶ 40).  Sehgal frequently worked at Lee's Summit #2 during the remodel.  (DSOF, ¶ 41; PRDSOF, ¶ 41).  The remodel at Lee's Summit #2 necessitated significant change.  (DSOF, ¶ 45; PRDSOF, ¶ 45).  The store had new structures, new routines, new procedures within the floral department, a new ordering line, new product lines, and new pricing systems.  (*Id.*).  The whole department was redone, not just physically, but pricing-wise and staff-wise.  (*Id.*).  In this context, Sehgal's interactions with Plaintiff were negative.  (Doc. 31-4, 45:2-8).  Plaintiff frequently pushed back on new policies and procedures by saying things like, "Well, that's just stupid.  I'm not doing it that way."  (*Id.*).

After Plaintiff transferred to Lee's Summit #1, Sehgal continued to interact with Plaintiff and the other employees in the Floral Department there in Sehgal's role as Floral Supervisor.  (Doc. 31-5, ¶ 9).  Based on her interactions with Plaintiff, Sehgal believed Plaintiff did not have the skills needed to merchandise, to plan for sales increases, to find ways to move through items that may not have been selling very well, and to think outside the box to make sure that the shrink was not

---

[2] Sehgal worked for Hy-Vee for about 13 years and was terminated because, according to her, to "save pennies on [her]."  (PSOF, ¶ 128; DRPSOF, ¶ 128).  Sehgal did not know whether Plaintiff's claims were valid but felt she was not treated fairly by Hy-Vee.  (PSOF, ¶ 129; DRPSOF, ¶ 129).

high.  (Doc. 31-4, 50:5-15).  Sehgal concluded, based on her observations, that Plaintiff was not able to effectively problem solve, to deal with conflict, or to handle hard situations that arise when one is a Floral Manager.  (Doc. 31-4, 50:17-25, 54:10-20).  Sehgal testified that Plaintiff did not portray the skills and assets needed to handle those types of situations.  (Doc. 31-4, 50:25-51:2).

**E.      RaeJean Robertson**

RaeJean Robertson was born in 2000.  (DSOF, ¶ 50; PRDSOF, ¶ 50).  Robertson began working at the Belton store on June 11, 2019 and transferred to the Floral Department in October 2019.  (DSOF, ¶ 51; PRDSOF, ¶ 51).  As such, when Larson arrived at the Belton store in August 2020, Robertson was already working in the Floral Department and remained in that position at the time she interviewed for the Floral Manager position in June 2021.  (DSOF, ¶ 52; PRDSOF, ¶ 52).  Larson found Robertson reliable, friendly, and industrious.  (Doc. 31-3, ¶ 9).  Larson stated Robertson exuded a positive energy and worked well with other employees in the department. (*Id.*).  Robertson was also familiar with the Belton Floral Department.  (*Id.*).

Sehgal worked with Robertson throughout the remodel at the Belton store.  (Doc. 31-4, 56:2-7).  In Sehgal's observation, Robertson was a good communicator and very hard working. (*Id.* at 56:12-24).  Sehgal found Robertson helpful when transitioning the Belton Floral Department to a temporary location.  (*Id.*).  Robertson helped Sehgal problem solve and provided helpful feedback on issues that arose during the transitional time.  (*Id.*).

**F.      Plaintiff's Applications Before 2021**

In March or April 2018, Plaintiff applied for the Floral Manager position at Lee's Summit #2.  (DSOF, ¶ 57; PRDSOF, ¶ 57).  She interviewed with Store Director Jeff Sesker for that position, but Sesker hired an employee named Mandy for the position.  (DSOF, ¶ 58; PRDSOF, ¶ 58).  Mandy was in her 30s and had been the Assistant Floral Manager at the Liberty store.  (*Id.*).

7

Sesker told Plaintiff he chose Mandy because she had been through a management training program. (DSOF, ¶ 59; PRDSOF, ¶ 59). In addition, the Floral Supervisor at the time had been Sesker's Floral Manager in the past and had recommended Mandy. (*Id.*). Plaintiff does not know anything else about Mandy's background or qualifications. (DSOF, ¶ 60; PRDSOF, ¶ 60).

In August 2018, Plaintiff applied for the Floral Manager position at Lee's Summit #1 and interviewed with Brad Walters, who was the then-Store Director there. (DSOF, ¶ 61; PRDSOF, ¶ 61). Walters hired Katie Stover for that position because Stover had worked in the Floral Department at Lee's Summit #1 for several years and he wanted to give her a chance. (DSOF, ¶ 62; PRDSOF, ¶ 62). Plaintiff does not believe Walters's decision had anything to do with age. (DSOF, ¶ 63; PRDSOF, ¶ 63).

## G. Plaintiff's Applications at the Belton Store

Whitney Larson became the Store Director at the Belton store in August 2020. (DSOF, ¶ 64; PRDSOF, ¶ 64). She held that position until she became a District Store Director over two stores in Independence in January 2022. (*Id.*).

On February 25, 2021, a job opening for the Floral Manager position at the Belton store was posted after the previous Floral Manager left the store. (Doc. 31-2, 74:15-17, 77:2-8; Doc. 31-10). In response to the posting, seven individuals applied, including Plaintiff, Shaylan Mitchell, and Chaundra Scott Keearns. (Doc. 31-10). Mitchell had been the Floral Manager at the Jefferson City store for approximately two-and-a-half years. (Doc. 32-2, Bates HV000062-63). She also had other managerial and floral retail experience. (*Id.*). Keearns was a Sales Manager at Aaron's but had previously held floral manager positions at two different grocery stores. (DSOF, ¶ 68; PRDSOF, ¶ 68). Plaintiff met the position's qualifications. (PSOF, ¶ 127; DRPSOF, ¶ 127).

After reviewing the applications, Larson spoke with Rod Dolph, the Store Director at the

Jefferson City store, about Mitchell and with Kory Robinson about Plaintiff. (Doc. 31-2, 68:15-25, 69:19-70:3; Doc. 31-3, ¶ 14). Larson spoke with Robinson after Plaintiff first applied. (Doc. 31-2, 69:19-70:25; Doc. 38-3, 53:5-13, 55:16-56:1, 58:14-17). Dolph had very positive feedback about Mitchell and indicated she was an excellent Floral Manager. (DSOF, ¶ 70; PRDSOF, ¶ 70). Robinson told Larson that Plaintiff was a very good designer and had good design experience but that her people skills were not great as far as dealing with customers and fellow employees. (Doc. 31-2, 69:1-6; Doc. 31-3, ¶ 16; Doc. 31-5, ¶¶ 12-13). Robinson also indicated Plaintiff had received customer complaints and did not work well with others. (Doc. 31-2, 69:7-11).

Larson spoke with Kaitlyn Sehgal about both Mitchell and Plaintiff. (Doc. 31-2, 68:15-21, 70:12-18; Doc. 31-4, 53:15-54:9, 64:18-65:3). It is unclear when Larson spoke with Sehgal. Larson stated Sehgal provided positive feedback on Mitchell, but Sehgal could not recall the contents of the conversation. (Doc. 31-3, ¶ 17; Doc. 38-3, 64:18-65:3). Sehgal told Larson that Plaintiff did not have all the qualities and skills to be able to fulfill that job successfully, in Sehgal's opinion. (DSOF, ¶ 75; PRDSOF, ¶ 75).

Larson first interviewed Mitchell. (Doc. 31-2, 82:24-83:2). After the interview, Larson offered the position to Mitchell, but Mitchell declined the offer. (Doc. 31-2, 78:3-79:2, 82:18-20). As a result, on March 10, 2021, the job posting was reopened. (Doc. 31-2, 79:13-16, 81:17-22).

Four people applied for the position from the March posting, including Plaintiff and Chaundra Scott Keearns. (DSOF, ¶ 78; PRDSOF, ¶ 78). Larson interviewed Keearns at that time. (Doc. 31-2, 105:18-24). Larson did not interview Plaintiff based on the feedback she had received from Robinson and possibly Sehgal. (Doc. 31-2, 69:20-70:25; Doc. 31-3, ¶¶ 14, 19-20; Doc. 38-3, 53:5-13, 55:16-56:1, 58:14-17). Keearns accepted the position and began as the Floral Manager at the Belton store on March 25, 2021. (DSOF, ¶ 81; PRDSOF, ¶ 81). Keearns was born in 1975.

(DSOF, ¶ 82; PRDSOF, ¶ 82).

Keearns was terminated on May 21, 2021 after failing to report to work. (DSOF, ¶ 83; PRDSOF, ¶ 83). As a result, the position was reposted again. (Doc. 31-2, 81:4-22; Doc. 31-10). After the May posting, Plaintiff was the only applicant who had any floral experience. (DSOF, ¶ 85; PRDSOF, ¶ 85). Defendant then reopened the posting on June 6, 2021. (Doc. 31-10). Two additional people applied in response to the June posting: RaeJean Robertson and Vickie Conroy. (Doc. 32-5). Both had floral experience but no management experience. (*Id.*; Doc. 31-2, 119:8-11).

After receiving the applications, Larson spoke with Sehgal about Robertson. (DSOF, ¶ 87; PRDSOF, ¶ 87). Sehgal told Larson she thought Robertson would make a good Floral Manager and provided feedback consistent with Larson's own observations of Robertson. (DSOF, ¶ 88; PRDSOF, ¶ 88). Larson interviewed both Robertson and Plaintiff. (Doc. 31-3, ¶¶ 25-26). Larson stated she decided to interview Plaintiff despite the concerning feedback from Robinson and Sehgal because of the overall weakness of the applicant pool. (Doc. 31-2, 104:22-107:1; Doc. 31-3, ¶ 26). According to Plaintiff, the interview lasted about ten minutes. (DSOF, ¶ 91; PRDSOF, ¶ 91). Larson asked the basic questions about Plaintiff's experience and discussed what Larson expected out of a manager. (*Id.*). Plaintiff described her experience in high school, at Tobler's Flowers, at Food Barn, and at IGA/Apple Market. (DSOF, ¶ 92; PRDSOF, ¶ 92). The only other thing Plaintiff remembers about the interview is Larson saying, "As you can see by my plant sitting in the corner, I'm not very good with plants, but I was on vacation and nobody watered it, so I guess I need to water it." (DSOF, ¶ 93; PRDSOF, ¶ 93). Plaintiff responded, "I suggest you throw it in the trash because it's not coming back." (*Id.*).

Larson stated in her declaration that Robertson discussed her love of the department at

Belton and her desire to lead it during her interview. (DSOF, ¶ 94; PRDSOF, ¶ 94). Robertson discussed how eager she was to learn and that she was willing to do whatever was needed to make the department succeed. (*Id.*). Robertson was upbeat and positive throughout the interview. (DSOF, ¶ 95; PRDSOF, ¶ 95). She discussed her current knowledge of the department and her desire to grow and make a career with Hy-Vee. (*Id.*).

Based on all the information Larson had about Plaintiff and Robertson, Larson decided to offer the position to Robertson, who accepted. (DSOF, ¶ 96; PRDSOF, ¶ 96). Plaintiff believes Larson chose Robertson over her because Robertson was young and Larson could mold her. (DSOF, ¶ 97; PRDSOF, ¶ 97). Plaintiff believes this is the only reason Larson chose Robertson over Plaintiff. (DSOF, ¶ 98; PRDSOF, ¶ 98). Plaintiff claims Robertson was "pushed out" of the floral department after less than one year because she did not know what she was doing. (PSOF, ¶ 126; DRPSOF, ¶ 126).

## H.    Plaintiff's Applications After the Belton Store

In November 2021, Plaintiff applied for a Floral Manager position at the Blue Springs store. (DSOF, ¶ 99; PRDSOF, ¶ 99). The Blue Springs Store Director and Human Resources ("HR") Manager interviewed Plaintiff. (DSOF, ¶ 100; PRDSOF, ¶ 100). While Plaintiff was on her way home from the interview, the HR Manager called and offered her the job. (DSOF, ¶ 101; PRDSOF, ¶ 101). The HR Manager initially offered Plaintiff $19 per hour. (DSOF, ¶ 102; PRDSOF, ¶ 102). Plaintiff said she would not take the job for that amount of money. (*Id.*). In response, the HR Manager said she could go to $20 per hour but would have to talk to the Store Director in order to offer anything higher than that. (*Id.*). Plaintiff replied that the HR manager would have to talk to the Store Director because Plaintiff would not take it for less than $25 per hour. (DSOF, ¶ 103; PRDSOF, ¶ 103). The previous Floral Manager at Blue Springs store made

11

$20 per hour when she left. (DSOF, ¶ 104; PRDSOF, ¶ 104). The next day, Plaintiff got an email saying she did not get the job. (DSOF, ¶ 105; PRDSOF, ¶ 105).

In May 2022, Plaintiff applied for the Floral Manager position at the Belton store but did not receive an interview. (DSOF, ¶ 106; PRDSOF, ¶ 106). Caitlin Blevins was hired for that position. (DSOF, ¶ 107; PRDSOF, ¶ 107). Plaintiff is not familiar with Blevins's work history or qualifications except that one Store Director told her she worked at a different Hy-Vee store and had been an assistant manager for two years. (*Id.*). Plaintiff does not know who made the hiring decision and does not know whether it had anything to do with her age but testified Blevins is younger than Plaintiff. (DSOF, ¶ 108; PRDSOF, ¶ 108).

In December 2022, Plaintiff applied for a Floral Manager position at Lee's Summit #2 but was not interviewed. (DSOF, ¶ 109; PRDSOF, ¶ 109). Tamme Williams was hired for that position. (DSOF, ¶ 110; PRDSOF, ¶ 110). Williams was born in 1964. (*Id.*). Williams had 43 years of experience in floral retail. (DSOF, ¶ 111; PRDSOF, ¶ 111). At the time she applied, she had been the manager of a floral department at a different grocery store for four years and had decades of managerial experience at floral shops and/or in floral departments over the years. (*Id.*). Plaintiff does not know who made the hiring decision. (DSOF, ¶ 112; PRDSOF, ¶ 112).

**J.      Other Relevant Hiring Decisions**

During her time as the Belton Store Director, Larson promoted Pam Lee to be the Aisles On Line Manager. (DSOF, ¶ 113; PRDSOF, ¶ 113). Lee was born in 1961. (DSOF, ¶ 114; PRDSOF, ¶ 114). Larson also hired Marty Krause to be the Produce Manager at the Belton store. (DSOF, ¶ 115; PRDSOF, ¶ 115). Krause had previously been the Produce Manager at the Raytown store. (*Id.*). Krause was born in 1962. (DSOF, ¶ 116; PRDSOF, ¶ 116).

After Larson became the District Store Director over the two Independence stores, Larson

12

promoted Mark Weston to the Floral Manager position at Independence #1. (DSOF, ¶ 117; PRDSOF, ¶ 117). Weston was born in 1968. (DSOF, ¶ 118; PRDSOF, ¶ 118).

**K.      Plaintiff's Charge of Discrimination and Claim**

Plaintiff filed a charge of discrimination on September 21, 2021. (DSOF, ¶ 119; PRDSOF, ¶ 119). She has never filed another charge of discrimination. (*Id.*). In her charge of discrimination, Plaintiff alleges she was routinely passed over for promotions at Hy-Vee but only specifically references a floral manager position at Lee's Summit #1 in June 2021. (DSOF, ¶ 120; PRDSOF, ¶ 120). Lee's Summit #1 did not hire a floral manager in June 2021. (DSOF, ¶ 121; PRDSOF, ¶ 121). Katie Stover was hired as the Floral Manager at Lee's Summit #1 in 2018 and remains in that position to date. (*Id.*). As discussed above, the place Plaintiff applied for a manager position in June 2021 was at the Belton store. (DSOF, ¶ 122; PRDSOF, ¶ 122).

The only Hy-Vee employee to whom Plaintiff ever spoke about her belief that she had suffered age discrimination was Katie Stover. (DSOF, ¶ 123; PRDSOF, ¶ 123). Plaintiff complained of age discrimination to Stover twice. (DSOF, ¶ 124; PRDSOF, ¶ 124). The first time was the day after she learned she did not receive the Floral Manager position at the Belton store. (*Id.*). Plaintiff cannot recall when she made the second complaint, but it was sometime after that. (DSOF, ¶ 125; PRDSOF, ¶ 125). The second complaint also related to the Floral Manager position at Belton. (*Id.*).

**II.      LEGAL STANDARD**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A court considering a motion for summary judgment must view the evidence and inferences that may be reasonably drawn from the evidence in the light most favorable to the

13

nonmoving party." *Dryer v. NFL*, 814 F.3d 938, 941-42 (8th Cir. 2016). "Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence demonstrating a genuine dispute as to a material fact." *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011). Parties resisting a motion for summary judgment "may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial." *Dryer*, 814 F.3d at 942 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Green Plains Otter Tail, LLC v. Pro-Env't., Inc.*, 953 F.3d 541, 545 (8th Cir. 2020). However, summary judgment should not be granted if a reasonable jury could find for the nonmoving party. *Danker v. City of Council Bluffs, Iowa*, 53 F.4th 420, 423 (8th Cir. 2022) (citing *Anderson*, 477 U.S. at 248).

### III. ANALYSIS

Plaintiff claims Defendant discriminated against her based on age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, when it failed to promote her to the Floral Manager position at the Belton store in June 2021. (Doc. 1-1, pp. 16-23; Doc. 38, pp. 18-19). Absent direct evidence of age discrimination, claims arising under the ADEA are analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Smothers v. Rowley Masonic Assisted Living Cmty., LLC*, 63 F.4th 721, 727 (8th Cir. 2023).

Under the burden-shifting framework, a plaintiff must first establish a *prima facie* case of discrimination. *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 515 (8th Cir. 2011). To establish a prima facie case of age discrimination…, a plaintiff must prove "(1) that the plaintiff was in the protected age group (over forty); (2) that the plaintiff was otherwise qualified for the

position; (3) that the plaintiff was not [promoted]; and (4) that the employer hired a younger person to fill the position." *Id.* (quoting *Wingate v. Gage Cty. Sch. Dist., No. 34*, 528 F.3d 1074, 1079 n.3 (8th Cir. 2008)). "The burden then shifts to the employer 'to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" *Lindeman v. St. Luke's Hosp. of Kansas City*, 899 F.3d 603, 606 (8th Cir. 2018) (quoting *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 768 (8th Cir. 2008)). Lastly, "the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for intentional discrimination." *Id.* (quoting *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014)).

For purposes of summary judgment, Defendant does not dispute that Plaintiff can establish a *prima facie* case of age discrimination. (Doc. 31, p. 21). Instead, Defendant argues that the uncontroverted evidence demonstrates that it had legitimate, nondiscriminatory reasons for its decisions and Plaintiff cannot prove pretext. (*Id.*). Specifically, Defendant contends that concerns about Plaintiff's managerial skills raised by Robinson (her Store Director) and Sehgal (the Floral Supervisor), candidate interviews, and Larson's own observations of the applicants are legitimate, nondiscriminatory reasons for not selecting Plaintiff for the Floral Manager position at the Belton store. (*Id.* at pp. 21-23).

The record confirms Defendant's reasons. Plaintiff either admitted or could not point to evidence controverting that, in Robinson's and Sehgal's opinions, Plaintiff did not possess the skills to be a successful Floral Manager. And Plaintiff has not provided evidence showing that Larson's stated observations and impressions of the candidates were false. As such, the burden shifts back to Plaintiff to show Defendant's reasons are merely pretext. *Prod. Fabricators*, 763 F.3d at 969.

"A plaintiff may show pretext, among other ways, by showing that an employer (1) failed

to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010). Plaintiff has not shown that Defendant failed to follow its policies or has shifted its explanation of the decision to hire others as the Floral Manager at Belton over her. Nor has Plaintiff disputed that Larson promoted and/or hired others similar in age to Plaintiff to other department manager positions.

Nonetheless, Plaintiff argues Defendant's reasons are pretext because it is not entirely clear when Larson asked Robinson and Sehgal for feedback about Plaintiff. (Doc. 38, pp. 17-18). Plaintiff's argument misses the mark. Plaintiff has not claimed that Larson's selection of Mitchell or Keearns over Plaintiff was discriminatory. Her claim centers on Larson's selection of Robertson over Plaintiff in June 2021. Although the record does not indicate the exact date(s) Larson spoke with Robinson and Sehgal regarding Plaintiff's qualifications, it does establish that the conversations occurred prior to Larson choosing Robertson over Plaintiff. And again, Plaintiff admitted Sehgal told Larson that Plaintiff did not have all the qualities and skills to be able to fulfill the Floral Manager position successfully. Nor does Plaintiff have any evidence contradicting what Robinson told Larson about Plaintiff's abilities to be a good Floral Manager. Given the existence of these concerns in comparison to Larson's positive observations of Robertson, with whom Larson already worked, Defendant had legitimate, non-discriminatory reasons for its hiring/promotion decision. Plaintiff has not established those reasons were pretext.

## **CONCLUSION**

Plaintiff cannot show that Defendant's legitimate, nondiscriminatory reasons for not selecting her for the Floral Manager position in Belton were pretext. For this reason and the reasons discussed above, Defendant's Motion for Summary Judgment is GRANTED.

**IT IS SO ORDERED.**

                                        s/ Gary A. Fenner
                                        GARY A. FENNER, JUDGE
                                        UNITED STATES DISTRICT COURT

DATED: May 13, 2024